**Lawrence S. BITTAKER,
Petitioner–Appellee,**

**v.**

**Jeanne S. WOODFORD, Warden, California State Prison of San Quentin, Respondent–Appellant.**

No. 02–99000.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 27, 2003.

Filed June 6, 2003.

A. Scott Hayward, Deputy Attorney General, Los Angeles, CA, argued for the respondent-appellant. Bill Lockyer, Attorney General of the State of California, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, Donald E. De Nicola, Supervising Deputy Attorney General, and Keith H. Borjon, Supervising Deputy Attorney General, joined him on the briefs.

C. Renée Manes, Deputy Federal Public Defender, Los Angeles, CA, argued for the petitioner-appellee. Maria E. Stratton, Federal Public Defender, and Margo Rocconi, Deputy Federal Public Defender, joined her on the brief.

Before SCHROEDER, Chief Judge, PREGERSON, KOZINSKI, O'SCANNLAIN, T.G. NELSON, HAWKINS, TASHIMA, FISHER, PAEZ, BERZON and RAWLINSON, Circuit Judges.

Opinion by Judge KOZINSKI; Concurrence by Judge O'SCANNLAIN.

## OPINION

KOZINSKI, Circuit Judge.

Lawrence Bittaker was convicted in California state court of multiple murders and was sentenced to death. After unsuccessfully exhausting his state remedies, *In re Bittaker*, No. S052371, 2000 Cal. LEXIS 9066 (Cal. Nov. 29, 2000); *In re Bittaker*, No. S058797, 2000 Cal. LEXIS 9067 (Cal. Nov. 29, 2000), Bittaker filed a federal habeas petition pursuant to 28 U.S.C. § 2254 raising a multitude of claims, including a variety of ineffective assistance of counsel claims.

■ It has long been the rule in the federal courts that, where a habeas petitioner raises a claim of ineffective assistance of counsel, he waives the attorney-client privilege as to all communications with his allegedly ineffective lawyer. *See, e.g., Wharton v. Calderon,* 127 F.3d 1201, 1203 (9th Cir.1997); *Tasby v. United States,* 504 F.2d 332, 336 (8th Cir.1974); *Laughner v. United States,* 373 F.2d 326, 327 (5th Cir.1967). The question present-

ed to us is the *scope* of the habeas petitioner's waiver: Does it extend only to litigation of the federal habeas petition, or is the attorney-client privilege waived for all time and all purposes—including the possible retrial of the petitioner, should he succeed in setting aside his original conviction or sentence?

The district court entered a protective order precluding use of the privileged materials for any purpose other than litigating the federal habeas petition, and barring the Attorney General from turning them over to any other persons or offices, including, in particular, law enforcement or prosecutorial agencies.[1] The state appeals this order, arguing that petitioner completely waived his privilege and the district court therefore had no authority to preclude dissemination of these non-privileged materials, or their use to re-prosecute petitioner.[2]

## Jurisdiction

■ The challenged order is not a final judgment, yet the parties agree that it is reviewable as a collateral order pursuant to 28 U.S.C. § 1291. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545–47, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). While we ultimately agree, the matter is closer than the concurrence of the parties would suggest. The protective order is, after all, reviewable on appeal from the final judgment, no matter who wins below on the merits. *See, e.g., Anderson v. Calderon*, 232 F.3d 1053, 1061–62, 1099–100 (9th Cir.2000) (reviewing the denial of petitioner's request for a protective order on his appeal from the district court's final denial of his habeas petition). Moreover, at that time we will know much more about the practical effect of the order, if any. If petitioner is unsuccessful in any of his claims, and no retrial is necessary, the order would become irrelevant for all practical purposes.

Nevertheless, we conclude that the order is appealable because significant strategic decisions turn on its validity; review after final judgment may therefore come

1. The order in its entirety reads as follows:

   All discovery granted to respondent pursuant to respondent's motion to discover trial counsels' files and conduct depositions of trial counsel, petitioner's defense team and petitioner, shall be deemed to be confidential. These documents and material (hereinafter "documents") may be used only by representatives from the Office of the California Attorney General and only for purposes of any proceedings incident to litigating the claims presented in the petition for writ of habeas corpus pending before this Court. Disclosure of the contents of the documents and the documents themselves may not be made to any other persons or agencies, including any other law enforcement or prosecutorial personnel or agencies, without an order from this Court. This order shall continue in effect after the conclusion of the habeas corpus proceedings and specifically shall apply in the event of a retrial of all or any portion of petitioner's criminal case, except that either party

   maintains the right to request modification or vacation of this order upon entry of final judgment in this matter.

   This Court recognizes that Respondent objects to entry of this protective order, and that Petitioner contends the required disclosures in this action do not constitute a waiver of his rights under the 5th and 6th Amendment in event of any retrial. *The Court may vacate this order at any time'. The parties will immediately advise the court . of any future rulings in Osband v. Woodford* [, 290 F.3d 1036 (9th Cir.2002) ].
   ER at 8–9 (underscored portion in handscript).

2. The parties spill much ink on the subsidiary question whether the district court would have had discretion to enter the protective order even if the disclosed materials lost their privilege for all purposes. Because we conclude that petitioner's waiver extends only to the federal habeas proceedings, and the materials therefore remain privileged for all other purposes, we do not reach this question.

too late. If petitioner relies on the protective order by releasing privileged materials and it turns out to be invalid, he will suffer serious prejudice during any retrial. Similar reasoning has led some of our sister circuits to accept interlocutory appeals of discovery orders under the collateral order doctrine. *See, e.g., In re Ford Motor Co.,* 110 F.3d 954, 962–64 (3d Cir.1997) ("Appeal after final judgment cannot remedy the breach in confidentiality occasioned by erroneous disclosure of protected materials.... [T]he cat is already out of the bag.... [T]here is no way to unscramble the egg scrambled by the disclosure...."); *In re Cont'l Ill. Sec. Litig.,* 732 F.2d 1302, 1307–08 (7th Cir.1984) ("Once the Report was released, any error in releasing it would be impossible to correct."); *In re Grand Jury Investigation of Ocean Transp.,* 604 F.2d 672, 673–74 (D.C.Cir.1979) (per curiam) (holding that, because the district court's order "conclusively determined the question of waiver" of the attorney-client privilege, appellant "must pursue its claim of attorney-client privilege at this time in order to ensure that its claim not later become moot by reason of the documents' disclosure to third parties"); *S. Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe,* 599 F.2d 707, 712 (5th Cir.1979) ("[B]ecause[information], once revealed, could not again be concealed, review following a decision on the merits would come too late....").

Moreover, as the Attorney General points out, the order complicates the litigation process, even if it is ultimately vacated.[3] The uncertainty of the order's validity will significantly increase the cost, delay and burden for the parties and the court.

We have reviewed such orders under the collateral order doctrine in the past. *See, e.g., Osband v. Woodford,* 290 F.3d 1036, 1039–41 (9th Cir.2002); *Wharton,* 127 F.3d at 1203–04. For the foregoing reasons, we see no reason to depart from this practice. Rather, we agree with the parties that considerations of "inconvenience and costs" to the judicial system as a whole and "the danger of denying justice by delay" favor asserting appellate jurisdiction at this time. *Johnson v. Jones,* 515 U.S. 304, 315, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) (internal quotation marks omitted).

## The Merits

■ **A.** The rule that a litigant waives the attorney-client privilege by putting the lawyer's performance at issue during the course of litigation dates back to at least *Hunt v. Blackburn,* 128 U.S. 464, 9 S.Ct. 125, 32 L.Ed. 488 (1888), where the Court stated: "When Mrs. Blackburn entered

---

**3.** At oral argument, the Attorney General described the practical problem in the following terms:

> Court: Is there something you want to disclose to somebody?
>
> State: Absolutely. We already dealt with this problem in the context of this case. Something came up in the course of Mr. Bittaker's deposition that was inconsistent with information that I have from the district attorney's office.
>
> ....
>
> Court: What did you do then? When that happened, what did you do? Did you go into court and say "I want to be able to disclose this ..."?
>
> State: I called opposing counsel and said ..., "I'd like to discuss some of these matters with the district attorney's office based on things that Mr. Bittaker said in his deposition." They said we won't agree to that. We'll have to litigate that.
>
> Court: And?
>
> State: And I didn't have time to do it. I don't have time to go to court every time I need to have a telephone conversation with someone in the district attorney's office or the law enforcement officers that investigated the case.

Oral Argument in *Bittaker v. Woodford,* No. 02–99000 (9th Cir. Mar. 27, 2003).

upon a line of defence which involved what transpired between herself and Mr. Weatherford [her lawyer], and respecting which she testified, she waived her right to object to his giving his own account of the matter." *Id.* at 470–71, 9 S.Ct. 125. The Court thought this proposition so self-evident it felt no need to support it with either citation to authority or further analysis. In the intervening years, courts and commentators have come to identify this simple rule as the fairness principle. *See, e.g., United States v. Amlani,* 169 F.3d 1189, 1196 (9th Cir.1999); 8 John Henry Wigmore, *Evidence in Trials at Common Law* § 2327, at 636 (John T. McNaughton rev., 1961) [hereinafter *Wigmore on Evidence* ]. The principle is often expressed in terms of preventing a party from using the privilege as both a shield and a sword. *See, e.g., Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156, 1162 (9th Cir.1992) ("The privilege which protects attorney-client communications may not be used both as a sword and a shield."); 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 503.41[1], at 503–104.1 to.2 (Joseph M. McLaughlin ed., 2d ed. 2003) ("[T]he privilege may be found to have been waived by implication when a party takes a position in litigation that makes it unfair to protect that party's attorney-client communications.... The doctrine of waiver by implication reflects the position that the attorney-client privilege was intended as a shield, not a sword." (internal quotation marks omitted)). In practical terms, this means that parties in litigation may not abuse the privilege by asserting claims the opposing party cannot adequately dispute unless it has access to the privileged materials. The party asserting the claim is said to have implicitly waived the privilege. *See, e.g.,* Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence: Practice Under the Rules* § 5.30, at 549 (2d ed. 1999) ("Substantial authority holds the attorney-client privilege to be impliedly waived where the client asserts a claim or defense that places at issue the nature of the privileged material.").

Such waivers by implication differ materially from the more traditional express waivers.[4] An express waiver occurs when a party discloses privileged information to a third party who is not bound by the privilege, or otherwise shows disregard for the privilege by making the information public. *See generally* Mueller & Kirkpatrick § 5.28, at 530–33; *Developments in the Law—Privileged Communications,* 98 Harv. L.Rev. 1450, 1630 & n. 2 (1985) [hereinafter *Privileged Communications* ]. Disclosures that effect an express waiver are typically within the full control of the party holding the privilege; courts have no role in encouraging or forcing the disclosure—they merely recognize the waiver after it has occurred. The cases upon which the state relies, *see, e.g., Permian Corp. v. United States,* 665 F.2d 1214, 1219–22 (D.C.Cir.1981); *Westinghouse Elec. Corp. v. Republic of the Philippines,* 951 F.2d 1414, 1423–27 (3d Cir.1991), fall

---

4. Despite the somewhat misleading nomenclature, an "express" waiver need not be effectuated by words or accompanied by the litigant's subjective intent. *See generally* 1 *McCormick on Evidence* § 93, at 371 (John W. Strong ed., 5th ed.1999). Rather, the privilege may be waived by the client's, and in some cases the attorney's, actions, even if the disclosure that gave rise to the waiver was inadvertent. *See Weil v. Inv./Indicators, Research & Mgmt., Inc.,* 647 F.2d 18, 24–25 & n.

13 (9th Cir.1981); 8 *Wigmore on Evidence* § 2325, at 632–33. To avoid confusion, some commentators use the term "waiver by voluntary disclosure" to distinguish this type of waiver from "implied waiver," or "waiver by claim assertion." *See* Mueller & Kirkpatrick §§ 5.28, 5.30, at 530, 549; *Weinstein's Federal Evidence* §§ 503.40.41[1], at 503–102 to – 104.3. Labels aside, this case concerns the latter type of waiver.

into this category. These cases hold that, once documents have been turned over to another party voluntarily, the privilege is gone, and the litigant may not thereafter reassert it to block discovery of the information and related communications by his adversaries. *See also In re Sealed Case*, 676 F.2d 793, 809 (D.C.Cir.1982).[5] Because these express waiver cases do not involve the court-ordered disclosure of privileged information after "the client [has] assert[ed] a claim or defense that place[d] at issue the nature of the privileged material," Mueller & Kirkpatrick § 5.30, at 549, we do not find them particularly useful in ascertaining the scope of Bittaker's waiver of his attorney-client privilege under the fairness principle. *See In re von Bulow*, 828 F.2d 94, 101–02 (2d Cir.1987) (declining to extend the fairness principle to disclosures made outside the course of judicial proceedings).

We look, instead, to the doctrine of implied waiver. "[T]he doctrine of implied waiver allocates control of the privilege between the judicial system and the party holding the privilege." *Privileged Communications*, 98 Harv. L.Rev. at 1630. The court imposing the waiver does not order disclosure of the materials categorically; rather, the court directs the party holding the privilege to produce the privileged materials *if* it wishes to go forward with its claims implicating them. The court thus gives the holder of the privilege a choice: If you want to litigate this claim, then you must waive your privilege to the extent necessary to give your opponent a

fair opportunity to defend against it. *See, e.g., Amlani*, 169 F.3d at 1195 (holding that courts must evaluate "whether allowing the privilege would deny the opposing party access to information vital to its defense" (internal quotation marks omitted)); *Chevron*, 974 F.2d at 1162. Essentially, the court is striking a bargain with the holder of the privilege by letting him know how much of the privilege he must waive in order to proceed with his claim.

■ Three important implications flow from this regime. The first is that the court must impose a waiver no broader than needed to ensure the fairness of the proceedings before it. Because a waiver is required so as to be fair to the opposing side, the rationale only supports a waiver broad enough to serve that purpose. Courts, including ours, that have imposed waivers under the fairness principle have therefore closely tailored the scope of the waiver to the needs of the opposing party in litigating the claim in question. *See, e.g., Kerr v. U.S. Dist. Court*, 426 U.S. 394, 405, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976) (recognizing the need to ensure that the "balance between petitioners' claim[ ] of ... privilege and plaintiffs' asserted need for the documents is correctly struck"); *Amlani*, 169 F.3d at 1196 (holding that "only those documents or portions of documents relating to the [claim asserted by the client] [should be] disclosed"); *Greater Newburyport Clamshell Alliance v. Pub. Serv. Co.*, 838 F.2d 13, 22 (1st Cir.1988) (holding that the client need reveal only

---

**5.** Although we do not decide the case under the express waiver doctrine, we note that the law in this area is not as settled as the state would have us believe. *See, e.g., Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 604 n. 1, 611 (8th Cir.1977) (holding that voluntary disclosure of information to the SEC resulted only in a limited waiver and that the information remained privileged in subsequent private litigation); *In re von Bulow*, 828 F.2d 94,

103 (2d Cir.1987) ("[W]here ... disclosures of privileged information are made extrajudicially and without prejudice to the opposing party, there exists no reason in logic or equity to broaden the waiver beyond those matters actually revealed."); Mueller & Kirkpatrick § 5.28, at 541 (noting that "[t]he trend of modern cases" is toward finding only limited waivers).

information "for which defendants have so far shown a true need and without which they may be unfairly prejudiced in their defense"); *see also* Mueller & Kirkpatrick § 5.31, at 553 (suggesting that "in applying the doctrine of implied waiver by claim assertion, courts must be careful to target only" those privileged materials without which the adverse party would be unfairly prejudiced).

■ Second, the holder of the privilege may preserve the confidentiality of the privileged communications by choosing to abandon the claim that gives rise to the waiver condition. *Cf. Lyons v. Johnson,* 415 F.2d 540, 541–42 (9th Cir.1969) (affirming dismissal of plaintiff's complaint after she persisted in hiding behind the privilege against self-incrimination by refusing to answer any deposition questions or to submit to discovery).

■ Finally, if a party complies with the court's conditions and turns over privileged materials, it is entitled to rely on the contours of the waiver the court imposes, so that it will not be unfairly surprised in the future by learning that it actually waived more than it bargained for in pressing its claims. *See Transamerica Computer Co. v. IBM Corp.,* 573 F.2d 646, 652 (9th Cir.1978) (holding that, because the district court had made an explicit ruling "protecting and preserving all claims of privilege" to expedite the parties' discovery, "IBM did not waive its right to claim the privilege as to any documents produced after [the] date [of the order]"). It follows that the court imposing the waiver must be able to bind the party receiving the privileged materials to the court's limitations and conditions. *See id.* The party receiving and using privileged materials pursuant to a court-imposed waiver implicitly agrees to the conditions of the waiver; if it does not wish to be bound, it is free to reject the materials and litigate without

them, but it must do so *before* any disclosure is made.

■ **B.** With these considerations in mind, we turn to the question of the proper scope of the waiver in cases such as the one now before us. We start by noting that, in the federal habeas context, we must strike a delicate balance between the interests of the state and those of the federal government. *See Duckworth v. Eagan,* 492 U.S. 195, 211, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989) (O'Connor, J., concurring) (noting that federal habeas review "has always been a flashpoint of tension in the delicate relationship of the federal and state courts"). The state, for its part, has established the attorney-client privilege, Cal. Evid.Code § 954, and has made it fully applicable to "all proceedings," *id.* § 910. The California Supreme Court has recently described the privilege as "fundamental to [its] legal system" and "a hallmark of [its] jurisprudence." *People v. Superior Court (Laff)*, 25 Cal.4th 703, 715, 107 Cal.Rptr.2d 323, 23 P.3d 563 (2001) (internal quotation marks omitted). The "lawyer-client privilege," as it's officially known in California, is "no mere peripheral evidentiary rule, but is held vital to the effective administration of justice." *Roberts v. City of Palmdale,* 5 Cal.4th 363, 380, 20 Cal.Rptr.2d 330, 853 P.2d 496 (1993). State law imposes upon every attorney the duty " '[t]o maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client.' " *Laff,* 25 Cal.4th at 715, 107 Cal.Rptr.2d 323, 23 P.3d 563 (quoting Cal. Bus. & Prof.Code § 6068(e)). Lawyers in California, as elsewhere, consider this duty central to the attorney-client relationship.

At the same time, Congress has given state prisoners the right to petition the federal courts for collateral review of their state convictions to ensure that state pro-

ceedings comply with constitutional requirements. 28 U.S.C. § 2254. In performing their constitutional duties, the federal courts have determined that claims of ineffective assistance of counsel cannot be fairly litigated unless the petitioner waives his privilege for purposes of resolving the dispute. *See, e.g., Wharton,* 127 F.3d at 1203. However sensible and necessary the waiver rule might be in practice, it nonetheless runs counter to the rationale behind the privilege and carries with it the potential of severely undermining the state's interest in maintaining the confidentiality of attorney-client communications. Claims of ineffective assistance of counsel are routinely raised in felony cases, particularly when a sentence of death has been imposed. If the federal courts were to require habeas petitioners to give up the privilege categorically and for all purposes, attorneys representing criminal defendants in state court would have to worry constantly about whether their casefiles and client conversations would someday fall into the hands of the prosecution. In addition, they would have to consider the very real possibility that they might be called to testify against their clients, not merely to defend their own professional conduct, but to help secure a conviction on retrial. A broad waiver rule would no doubt inhibit the kind of frank attorney-client communications and vigorous investigation of all possible defenses that the attorney-client and work product privileges are designed to promote.[6]

Were such a broad waiver necessary to satisfy federal interests, the state's interest in protecting lawyer-client confidences might have to yield. But we can conceive of no federal interest in enlarging the scope of the waiver beyond what is needed to litigate the claim of ineffective assistance of counsel in federal court. A waiver that limits the use of privileged communications to adjudicating the ineffective assistance of counsel claim fully serves federal interests. *See Laughner,* 373 F.2d at 327. At the same time, a narrow waiver rule—one limited to the rationale undergirding it—will best preserve the state's vital interest in safeguarding the attorney-client privilege in criminal cases, thereby ensuring that the state's criminal lawyers continue to represent their clients zealously.

A narrow waiver rule is also consistent with the interests of the habeas petitioner in obtaining a fair adjudication of his petition and securing a retrial untainted by constitutional errors. Here, Bittaker is claiming that he was denied a constitutionally adequate criminal trial because he had ineffective counsel and for many other reasons as well. If he succeeds on any of these claims, it will mean that his trial was constitutionally defective. Extending the waiver to cover Bittaker's retrial would immediately and perversely skew the second trial in the prosecution's favor by handing to the state all the information in petitioner's first counsel's casefile. If a prisoner is successful in persuading a federal court to grant the writ, the court should aim to restore him to the position he would have occupied, had the first trial been constitutionally error-free. Giving the prosecution the advantage of obtaining the defense casefile—and possibly even forcing the first lawyer to testify against the client during the second trial—would

---

6. Although our decision is couched in terms of the attorney-client privilege, it applies equally to the work product privilege, a complementary rule that protects many of the same interests. *See Upjohn Co. v. United States,* 449 U.S. 383, 400, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).

assuredly not put the parties back at the same starting gate.

What's more, requiring the petitioner to enter such a broad waiver would force him to the painful choice of, on the one hand, asserting his ineffective assistance claim and risking a trial where the prosecution can use against him every statement he made to his first lawyer and, on the other hand, retaining the privilege but giving up his ineffective assistance claim. This would violate the spirit, and perhaps the letter, of *Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).[7] It is no answer to say that Bittaker created this dilemma for himself—that he was the one who voluntarily "chose" to challenge his conviction on grounds of ineffective assistance. The

7. Justice Harlan's opinion in *Simmons* holds that it would be constitutionally unacceptable to require a criminal defendant to choose between two *constitutional* rights—there, the right to remain silent (Fifth Amendment) and the right to be free from unreasonable searches (Fourth Amendment). The state agrees that the right to litigate a claim of ineffective assistance of counsel is of constitutional magnitude but argues vigorously that on the other side of the scale lies a mere state-created evidentiary right, namely, the attorney-client privilege. We need not decide whether the attorney-client privilege has a constitutional dimension in the criminal context; we note only that doing away with the privilege in all criminal cases would raise a nontrivial question whether defendants would still be getting *effective* assistance. *See, e.g., Black v. United States*, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966) (per curiam) (remanding the case for a new trial after government agents monitored and listened to confidential conversations between defendant and his attorney); *Williams v. Woodford*, 306 F.3d 665, 682 (9th Cir.2002) ("When the government deliberately interferes with the confidential relationship between a criminal defendant and defense counsel, that interference violates the Sixth Amendment right to counsel if it substantially prejudices the criminal defendant. Substantial prejudice results from the introduction of evidence gained through the interference against the defendant at trial, from the prosecution's use of confidential information pertaining to defense plans and strategy, and from other actions designed to give the prosecution an unfair advantage at trial." (citations omitted)); *Clutchette v. Rushen*, 770 F.2d 1469, 1471 (9th Cir.1985) ("[Although] the attorney-client privilege is merely a rule of evidence ..., government interference with the confidential relationship between a defendant and his counsel may implicate Sixth Amendment rights."); *United*

*States v. Castor*, 937 F.2d 293, 297 (7th Cir. 1991) ("Where the sixth amendment right to attorney-client confidentiality exists, prosecutorial violation of that privilege might lead to reversal of a resulting conviction if the defendant could show prejudice."); *Greater Newburyport Clamshell Alliance*, 838 F.2d at 21 ("[U]tmost candor between an attorney and client is essential to effective assistance of counsel."); *United States v. Rosner*, 485 F.2d 1213, 1224 (2d Cir.1973) ("[T]he essence of the Sixth Amendment right is, indeed, privacy of communication with counsel."); *Caldwell v. United States*, 205 F.2d 879, 881 (D.C.Cir. 1953) ("The Constitution's ... guarantees of due process of law and effective representation by counsel[ ] lose most of their substance if the Government can with impunity place a secret agent in a lawyer's office to inspect the confidential papers of the defendant and his advisers, to listen to their conversations, and to participate in their counsels of defense."); Mueller & Kirkpatrick § 5.8, at 434 ("It is doubtful that constitutional standards for adequacy of legal representation could be satisfied if a defendant's communications to his attorney were subject to unrestricted scrutiny by the prosecutor.").

More importantly, we do not agree with the state's description of the interests at stake. As we see it, petitioner is being asked either to bypass a claim that his first trial counsel was constitutionally ineffective, or to jeopardize the fairness of his second trial by giving the prosecution access to evidence it would not otherwise have—including, possibly, the testimony of defendant's first counsel. Thus, the right to a fair trial hangs on each side of the scale. We do not believe *Simmons* permits conditioning the assertion of a constitutional right quite so steeply, at least absent a compelling interest requiring such a choice.

Constitution guarantees Bittaker the right to effective assistance of counsel at trial, *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and Congress has provided him an avenue to claim that his constitutional rights were violated, 28 U.S.C. § 2254. As one of our sister circuits has recognized in a different context, one may be "a 'voluntary' party only because there is no other means of protecting legal rights.... The scope of required disclosure should not be so broad as to effectively eliminate any incentive to vindicate [one's] constitutional right[s]...." *Greater Newburyport Clamshell Alliance*, 838 F.2d at 21–22.

Nor would a narrowly tailored waiver unfairly prejudice the prosecution. State law precludes access to materials in the defense lawyer's casefile and commands the lawyer to stand mute if he has information damaging to his client. The fortuity that defendant's initial trial was constitutionally defective gives the prosecution no just claim to the lawyer's casefile or testimony. To the contrary, allowing the prosecution at retrial to use information gathered by the first defense lawyer—including defendant's statements to his lawyer—would give the prosecution a wholly gratuitous advantage. It is assuredly not consistent with the fairness principle to give one side of the dispute such a munificent windfall for use in proceedings unrelated to the matters litigated in federal court.

■ We are not alone in our concern about the effect of a broad waiver on the fairness of state criminal trials. In one case that has been brought to our attention, the California Supreme Court, during the course of a state habeas proceeding, entered an order very similar to the one here.[8] While the order is not published, and therefore presumably not binding in future cases,[9] it does seem to strike the same balance among the competing interests as we do. Significantly, the order specifically bars the use of privileged materials at petitioner's possible retrial.

---

Here, the state has offered no such compelling interest.

8. The order in its entirety reads as follows:

    S042737   In re Gerald Gallego
    on
    Habeas Corpus
    Regarding the documents provided by petitioner to respondent on July 17, 1996, in conjunction with this court's order to respondent to show cause (dated July 10, 1996):
    1. Respondent shall limit its use of the documents, and the information contained therein, to rebuttal of petitioner's habeas corpus claims, including responding to the order to show cause.
    2. Respondent shall not use the documents, or the information contained therein, against petitioner in any manner during any future proceeding, including any possible retrial; and
    3. Respondent shall treat the documents, and the information contained therein, as confidential and not disseminate them or disclose their contents other than in the course of its litigation of this habeas corpus proceeding.

*In re Gallego*, No. S042737 (Cal. Aug.14, 1996).

9. The precedential effect of an unpublished order of the California Supreme Court is unclear to us. On the one hand, because it is unpublished, the order is difficult to find and cite by litigants in future cases. On the other hand, the California Rules of Court, which do prohibit citation to unpublished opinions of the inferior courts of California, *see* Cal. Rules of Court 977, do not prohibit citation to unpublished orders of the state supreme court, *id.* Because the order does not disclose the rationale underlying it, we presume that it would be of limited authority as to the scope of the waiver under state law. Nevertheless, in crafting an analogous federal waiver rule, we find comfort in knowing that the state's highest court appears to share our view that a narrow waiver of the privilege strikes an appropriate balance among the interests of the habeas petitioner, the prosecution and the public.

While we can only infer the court's rationale, we believe it must have been similar to our own.[10]

**C.** Relying on the majority's analysis in *Anderson v. Calderon*, 232 F.3d 1053, 1099–100 (9th Cir.2000), the state argues that precluding the prosecution from using evidence found in defense counsel's casefile in subsequent state court proceedings "would constitute an unwarranted anticipatory interference with the prerogatives of the state courts" and "contravene basic principles of comity and federalism," in violation of *Younger v. Harris*, 401 U.S. 37, 43–54, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny. *Anderson*, 232 F.3d at 1099–100. But *Anderson* was decided on the mistaken premise that petitioner's waiver of the attorney-client privilege is

---

10. The state seeks to impugn the precedential force of the *Gallego* order by arguing that the California Supreme Court has entered inconsistent orders in other cases. But the only case it points to is *Hunter v. Superior Court*, No. S102669 (Cal. Jan. 3, 2002). *Hunter* is a very different case and does not undermine the significance of *Gallego*.

Hunter brought federal habeas proceedings raising, *inter alia*, an ineffective assistance claim, and the federal district court entered a protective order much like the one in our case. Hunter prevailed in federal court and was granted a new trial on grounds unrelated to his ineffective assistance claim. After the federal proceedings were over, the state moved the district court for reconsideration of the protective order in light of our opinion in *Anderson v. Calderon*, 232 F.3d 1053 (9th Cir.2000). Bowing to the force of *Anderson*, the district court vacated its protective order.

Back in state court, the prosecution relied on *Anderson* and the district court's order vacating the protective order to argue that Hunter's waiver of the privilege was not limited to the federal habeas proceedings. The state trial judge agreed and then proceeded to consider whether state law limited the waiver, even if federal law did not. Not surprisingly, the court concluded that state law did not supply an independent ground for limiting the scope of the waiver. *See Hunter v. Superior Court*, No. SC–11007 (Cal.Super.Ct. Oct. 24, 2001). Hunter sought review of that decision from the state court of appeal, No. A096762 (Cal.Ct.App. Nov. 27, 2001), and then from the state supreme court, No. S102669 (Cal. Jan. 3, 2002). It is this latter order on which the Attorney General relies in arguing that the California Supreme Court has issued orders inconsistent with that in *Gallego*.

The difference in the two cases is manifest. In *Gallego*, the state supreme court was in a position precisely analogous to that of a district court with jurisdiction over a federal habeas petition—it was the court that was imposing the implied waiver in the first instance and therefore the one with authority to determine the scope of the waiver. *See In re Gallego*, 18 Cal.4th 825, 831, 77 Cal.Rptr.2d 132, 959 P.2d 290 (1998) (recounting the procedural history of the case and noting that, after the federal district court denied the Attorney General's motion to dismiss petitioner's unexhausted claims, petitioner "file[d] in this court [the California Supreme Court] a petition for writ of habeas corpus to exhaust those claims"); *see also In re Gallego*, 959 P.2d 290, No. S042737, 1998 Cal. LEXIS 5142 (Aug. 3, 1998) (reviewing petitioner's thirty-five habeas claims in the first instance and rejecting all of them on the merits). In that situation, the California Supreme Court appears to have determined that the fairness principle calls for a limited waiver, one that doesn't permit the prosecution to use the privileged evidence on retrial.

In *Hunter*, the state trial court was misled by *Anderson* into concluding that federal law permitted use of the attorney-client materials beyond the federal habeas proceedings, and then concluded that state law did not supply the limitation it mistakenly believed federal law had omitted. The state supreme court did not disturb that ruling in its one-line order declining interlocutory review. We do not find the California Supreme Court's action in *Hunter* at all inconsistent with its order in *Gallego*. Indeed, the fact that the state attorney general, whose office presumably monitors these cases closely, was able to come up with nothing closer on point strengthens the force of the *Gallego* order and confirms our view that we are writing on the same page as the California Supreme Court on the question whether the prosecution should be able to use at retrial privileged materials obtained during the course of habeas proceedings.

governed by state law and therefore best determined by the state courts. *Id.* at 1100. For the reasons already explained, we hold that the scope of the implied waiver must be determined by the court imposing it as a condition for the fair adjudication of the issue before it. When that court is a federal court, the scope of the waiver is a matter of federal law. *See* Fed.R.Evid. 501; *Tennenbaum v. Deloitte & Touche,* 77 F.3d 337, 340 (9th Cir.1996) (applying federal law on the question of waiver); *Weil,* 647 F.2d at 24 (same). After all, it is the federal courts that are inducing petitioner to waive his privilege, so the federal courts must be able to guarantee the integrity of the bargain if petitioner chooses to waive the privilege so he can litigate his ineffective assistance of counsel claim. *See generally* William W Schwarzer et al., *California Practice Guide: Federal Civil Procedure Before Trial* § 11:113.15, at 11–70 (2002) ("In appropriate circumstances, courts may grant a protective order restricting the use of any discovery to the present lawsuit.... A court may also limit *dissemination* of information obtained through discovery" by, among other things, "restricting disclosure.").

Nor do we believe that the protective order impinges on the dignity or authority of the state courts. The power of courts, state as well as federal, to delimit how parties may use information obtained through the court's power of compulsion is of long standing and well-accepted. *See, e.g., Degen v. United States,* 517 U.S. 820, 826, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996) (noting that protective orders may be used "to prevent parties from using civil discovery to evade restrictions on discovery in criminal cases"); *E.I. DuPont De Nemours Powder Co. v. Masland,* 244 U.S. 100, 103, 37 S.Ct. 575, 61 L.Ed. 1016 (1917) ("It will be understood that if, in the opinion of the trial judge, it is or should become

necessary to reveal the secrets to others, it will rest in the judge's discretion to determine whether, to whom, and under what precautions, the revelation should be made."); *Brown Bag Software v. Symantec Corp.,* 960 F.2d 1465, 1469, 1471–72 (9th Cir.1992) (upholding a protective order that precluded plaintiff's in-house counsel from accessing defendant's trade secrets while providing the information to an independent consultant); *Covey Oil Co. v. Cont'l Oil Co.,* 340 F.2d 993 (10th Cir. 1965) (upholding a protective order that restricted access to sensitive documents to counsel and independent certified public accountants and prohibited use of the materials for competitive purposes), *overruled on other grounds as stated in FTC v. Alaska Land Leasing, Inc.,* 778 F.2d 577, 578 (10th Cir.1985); *Chem. & Indus. Corp. v. Druffel,* 301 F.2d 126, 130 (6th Cir.1962) (noting that the district court may enter a protective order prohibiting public disclosure of information obtained through discovery); *see also* 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2043, at 566 (2d ed.1994) (listing examples of protective orders "limiting the persons who are to have access to the information disclosed and the use to which these persons may put the information"). Courts could not function effectively in cases involving sensitive information—trade secrets, medical files and minors, among many others— if they lacked the power to limit the use parties could make of sensitive information obtained from the opposing party by invoking the court's authority.

The courts of California remain free, of course, to determine whether Bittaker waived his attorney-client privilege on some basis *other than* his disclosure of privileged information during the course of the federal litigation. In addition, if the district attorney is able to obtain the privi-

leged materials through a source other than the Attorney General's office, he would be free to present them to the state court and seek a ruling on their admissibility. The district court's order simply precludes a party before it from misusing materials it obtained for a limited purpose by invoking the court's power of compulsion. We are confident that the state courts will not feel in the least uncomfortable because a party may not use confidential information it secured by invoking our power and authority, just as we would respect a similar order limiting the use of privileged materials obtained during the course of state court litigation. This is comity, not encroachment.

We are comforted in our conclusion by the fact that the parties have failed to bring to our attention—and we have been unable to find—very many cases where the prosecution has even attempted to use privileged information obtained as a result of federal discovery procedures in a defendant's retrial. Except for a small handful of cases from our own court, all originating in California, *see Osband,* 290 F.3d at 1042–43; *Anderson,* 232 F.3d at 1099–100; *McDowell v. Calderon,* 197 F.3d 1253, 1255–56 (9th Cir.1999) (en banc) (per curiam), the only case we have found that even remotely raises this possibility is *United States v. Suarez,* 820 F.2d 1158 (11th Cir.1987). In *Suarez,* the defendant sought to withdraw his guilty plea, claiming that he was misinformed by his lawyer. The lawyer testified, and the plea was set aside. At trial, the same lawyer testified about Suarez's reaction—how his " 'attitude completely changed' when he heard [an][audio]tape containing his voice." *Id.* at 1159. This testimony supported the prosecution's theory that defendant was involved in secretly recorded meetings involving the charged offenses.

We are somewhat surprised by the result in *Suarez,* but note that this holding has not been replicated in the Eleventh Circuit or any other federal court in the intervening fifteen years. In any event, *Suarez's* two cautionary passages—explaining what issues the court there did *not* consider—distinguish the case from ours. First, in footnote 3, *Suarez* explicitly notes that the court did not consider the argument that the waiver of the privilege was limited to the suppression hearing, because counsel had not attempted to limit the scope of the waiver. *Id.* at 1160 n. 3. While it is not clear to us that counsel is required to utter magic words to demarcate the scope of the waiver, what matters for our purposes is that *Suarez* simply did not consider the limited waiver argument. Second, in the penultimate paragraph, the *Suarez* court tells us unequivocally that it did not consider *Simmons* because that argument had not been timely raised. *Id.* at 1161. We are reasonably confident that,' had the *Suarez* court considered these arguments, it would have reached a different conclusion.

■■■ **D.** We turn, finally, to the question of enforcement. As is evident, the narrow waiver rule we adopt today is not self-enforcing. That is to say, unlike the usual situation where those given access to confidential materials have an independent ethical, and perhaps legal, obligation to maintain that confidence (such as the ethical constraints on lawyers, doctors and the clergy), those who are given access to confidential attorney-client materials under our limited waiver rule have no such obligation or incentive. Given this absence of external constraints (external to the case), district courts have the obligation, whenever they permit discovery of attorney-client materials as relevant to the defense of ineffective assistance of counsel claims in habeas cases, to ensure that the party given such access does not disclose these

materials, except to the extent necessary in the habeas proceeding, i.e., to ensure that such a party's actions do not result in a rupture of the privilege.

Fortunately, district courts have ample tools at their disposal to ensure compliance with any limitations they impose on the dissemination of confidential materials. Parties in habeas cases, unlike those in ordinary civil cases, have no right to discovery. *Campbell v. Blodgett,* 982 F.2d 1356, 1358 (9th Cir.1993) ("[T]here simply is no federal right, constitutional or otherwise, to discovery in habeas proceedings as a general matter." (citing *Harris v. Nelson,* 394 U.S. 286, 296, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969))). In a habeas case, discovery under the Federal Rules of Civil Procedure is available "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." Rules Governing Section 2254 Cases in the United States District Courts [hereinafter Habeas Rules], Rule 6(a); *see Bracy v. Gramley,* 520 U.S. 899, 904, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997). If a district court exercises its discretion to allow such discovery "to the extent that . . . good cause [is] shown," it must ensure compliance with the fairness principle. To that end, it must enter appropriate orders clearly delineating the contours of the limited waiver before the commencement of discovery, and strictly police those limits thereafter.[11]

\*    \*    \*    \*    \*    \*

The district court was entirely justified in entering the protective order that is the subject of this appeal; indeed, it would have abused its discretion had it done otherwise. The portion of *Anderson v. Cal-*

*deron,* 232 F.3d 1053, that reached a contrary conclusion is overruled. On remand, the district court remains free to modify the order as it deems appropriate to fully protect petitioner's rights.

**AFFIRMED.**

O'SCANNLAIN, Circuit Judge, with whom Circuit Judge RAWLINSON joins, concurring in the judgment:

I concur in the result reached today by the court, that the protective order issued by the district judge was not an abuse of his discretion. Nevertheless, I cannot interpret Judge Byrne's order as broadly as the majority. Nor am I convinced that the state attorney-client privilege must remain intact. As I see it, while a federal court has ample discretion to proscribe improper use of discovery materials obtained through its proceedings, it has no authority to determine admissibility for such underlying information under *state* law. Indeed, nothing in Judge Byrne's order purports to make such a sweeping command.

I

Lawrence Bittaker is challenging his state conviction for multiple murders in this federal habeas corpus proceeding. He claims that he was deprived of effective assistance of counsel during his state court trial, and is thus being unconstitutionally detained. As the majority notes, it is axiomatic that when a client places the performance of his lawyer at issue, the client waives his or her right to assert the attorney-client privilege. *Supra,* at 718–719 (citing, among others, *Hunt v. Blackburn,* 128 U.S. 464, 9 S.Ct. 125, 32 L.Ed. 488

---

**11.** Without exhausting all the possible means to accomplish the required end, we note that district courts may, as happened here, enter a Fed.R.Civ.P. 26(c) protective order to limit distribution of the materials by the attorney representing the state. They may also incorporate the limited scope of the waiver in the discovery order itself when "grant[ing] leave" for discovery to proceed. Habeas Rule 6(a).

(1888), and *United States v. Amlani,* 169 F.3d 1189, 1195 (9th Cir.1999)). There is no dispute that Bittaker cannot both pursue his ineffective assistance of counsel claims and simultaneously oppose the State's request for discovery on the basis of the attorney-client privilege.

Cleverly, Bittaker refused to be deposed and refused to allow his trial counsel to be deposed or to allow the State access to his trial counsel's files without a protective order precluding dissemination of the discovered materials outside the federal habeas proceeding. Without determining the applicability of the attorney-client privilege [1] or making any representations as to the continuing viability of the privilege, the district court granted Bittaker's request. Nonetheless, the majority concludes that by filing the protective order the district court preserved the attorney-client privilege as to all future proceedings, specifically upon retrial in state court. I respectfully disagree.

## II

My disagreement with the majority lies not so much in its determination of the scope of the federal attorney-client privilege, although I have yet to be convinced by its reasoning,[2] but in its blanket pre-

---

1. I fail to see how the majority can uphold a protective order that precludes admissibility of all discovered evidence—based on the attorney-client privilege—without first concluding that such privilege exists. Under our law, the party who asserts the attorney-client privilege must first prove that it applies. *See United States v. Martin,* 278 F.3d 988, 999–1000 (9th Cir.2002) ("Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed.... The burden is on the party asserting the privilege to establish all the elements of the privilege." (citations and internal quote marks omitted)). Although some of the discoverable information is likely privileged, surely not all of it is. This is no small matter; as the majority interprets the protective order, it prohibits the state court from even considering the admissibility of evidence. What justification is there for the protective order extending beyond the confines of privileged material?

2. Federal courts have generally concluded that the information, once disclosed to a party opponent, waives the attorney-client privilege as to future proceedings. *See, e.g., United States v. Mass. Inst. of Technology,* 129 F.3d 681, 686 (1st Cir.1997) (holding that even if MIT was under a legal duty to disclose information pursuant to federal law because of its status as a defense contractor, it still waived privilege by providing such information to the IRS; MIT had the choice to become a defense contractor); *Genentech, Inc. v. United States Int'l Trade Comm'n,* 122 F.3d 1409, 1416, 1416–18 (Fed.Cir.1997) ("Once the attorney-client privilege has been waived, the privilege is generally lost for all purposes and in all forums."); *In re Steinhardt Partners, L.P.,* 9 F.3d 230, 236 (2d Cir.1993) ("An allegation that a party facing a federal investigation and the prospect of a civil fraud suit must make difficult choices is insufficient justification for carving a substantial exception to the waiver doctrine."); *Westinghouse Elec. Corp. v. Republic of the Philippines,* 951 F.2d 1414, 1425 (3d Cir.1991) ("The traditional waiver doctrine provides that disclosure to third parties waives the attorney-client privilege unless the disclosure serves the purpose of enabling clients to obtain informed legal advice."); *In re Martin Marietta Corp.,* 856 F.2d 619, 623–24 (4th Cir.1988) (holding that disclosure to government waived attorney-client privilege as to future proceedings); *In re von Bulow,* 828 F.2d 94, 101–02 (2d Cir.1987) (holding that party implicitly waived his attorney-client privilege when his attorney published privileged material in a book, and the client assisted in promoting the book, as to the matters discussed in the book); *United States v. Suarez,* 820 F.2d 1158, 1161 (11th Cir.1987) ("[I]t has long been held that once waived, the attorney-client privilege cannot be reasserted." (citing, among others, 8 Wigmore, Evidence § 2328 at 638 (McNaughton rev. 1961) ("A waiver at one stage of a trial should be final for all further stages ....") (additional citations and footnote omitted))); *Permian Corp. v. United States,* 665 F.2d 1214, 1221 (D.C.Cir.1981) ("The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrect-

emption of state consideration of the effect of disclosure on the state attorney-client privilege. Even if, *arguendo*, the waiver of the *federal* attorney-client privilege extends only so far as the habeas proceeding, I see no reason why the *state* attorney-client privilege must necessarily also remain intact.

The majority concludes that the scope of the waiver of the attorney-client privilege is determined under federal law. In the context of this case, the majority is correct: the admissibility of the evidence in a habeas proceeding is governed by the federal attorney-client privilege and thus the scope of any waiver *in these proceedings* is also determined under federal law.[3]

The majority fails to note, however, that when a party seeks to introduce evidence in a state tribunal raising issues of state criminal law the federal attorney-client privilege is no longer applicable. Fed. R. Ev. 1101(a) (limiting applicability of the federal rules of evidence to "actions, cases, and proceedings" in federal courts). The initial existence of any privilege and its continuing vitality are both issues of state law, *see* Cal. Evid.Code § 910 (attorney-client privilege applies in "all proceed-

ings"); *see also Evans v. Raines*, 800 F.2d 884, 887 n. 4 (9th Cir.1986) ("[B]ecause the attorney-client relationship is created and controlled by state law, the nature and extent of the attorney-client privilege is defined by state law."); *United States v. Rogers*, 751 F.2d 1074, 1077 (9th Cir.1985) ("Whether the communication between Rogers and his attorney, Miller, is in fact privileged and, thus, whether evidence of that communication can be objected to and excluded at trial, is a matter to be resolved in the trial court if the case proceeds to trial."), just as the existence and applicability of the attorney-client privilege is a matter of federal law when one seeks to introduce evidence into federal courts on a federal claim such as a petition for a writ of habeas corpus, *see* Fed.R.Evid. 501 (stating that the federal attorney-client privilege applies to claims of federal law); *see, e.g., Swidler & Berlin v. United States*, 524 U.S. 399, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998) (holding that under Federal Rule of Evidence 501 the attorney-client privilege survives the death of the client). The fact that the *federal* attorney-client privilege is not fully breached is not dispositive of the state's privilege.

ing the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit."). *But see Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 604 n. 1, 611 (8th Cir.1977) (finding limited waiver after disclosure to the SEC). The mere fact that the disclosure to opposing counsel is made in confidence, *i.e.*, under a protective order, should not alter the status of the waiver. *Cf. In re Grand Jury Subpoena Dated Dec. 17, 1996*, 148 F.3d 487, 492–93 (5th Cir.1998) (holding that federal statute that prohibited circulation of information outside of mediation proceedings did not create evidentiary privilege).

**3.** I am not even sure that we should be making any conclusions regarding the scope of the *federal* attorney-client privilege. There is

no dispute that Bittaker waived his attorney-client privilege in his habeas proceeding and must allow his attorney to testify; this evidence is discoverable and admissible under Federal Rule of Evidence 501. Why the court must determine *now* the extent of that waiver, and thus the admissibility of evidence in a later proceeding, even a later federal proceeding, is unclear. While I agree that it may permit Bittaker to make a more educated decision regarding the claims which he brings, there is simply no controversy yet regarding the admissibility of evidence. I would leave the issue for a future court to decide when a case is brought before it. *See Upjohn Co. v. United States*, 449 U.S. 383, 386, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (noting that adjudications of the attorney-client privilege must be done on a case-by-case basis).

Invoking federalism and comity, the majority remarkably concludes that a federal district court must nevertheless protect the sanctity of the State of California's attorney-client privilege by precluding the state from making an admissibility determination.[4] But, why are the state courts not free to conclude that the petitioner waived his state law privilege by his bringing a federal habeas petition on ineffective assistance of counsel grounds? Why is it necessarily *not* a waiver under state law if the federal privilege is undisturbed?

The majority's reasoning: the "fairness" principle. The majority concludes that because the "fairness" principle dictates that Bittaker's waiver is valid only in the current habeas proceedings federal courts must have the authority to preserve the "bargain" that the court struck with Bittaker. To preserve such "bargain," the majority commands that California state courts treat the information as privileged. The majority merely begs the question. How does the fairness principle provide the federal courts the right to "bargain" with the state's authority? Federal courts can strike whatever bargain they wish with

a petitioner, but we cannot simply sell the state's rights to pay for it.

## III

If indeed a conflict between the federal attorney-client privilege and the state privilege existed, the federal rule would of course triumph. This a merely a function of the Supremacy Clause. The majority, however, has not identified a conflict between the federal and state privileges—nor could it—the two privileges apply at different times, in different proceedings. *See* Fed. R. Ev. 1101(a)-(c); *see also* Timothy P. Glynn, *Federalizing Privilege*, 52 Am. U.L.Rev. 59, 148 (2002) (arguing that Congress must adopt a substantive federal attorney-client privilege to preempt "contrary state privilege rules"). As we stated in *Wharton v. Calderon*, 127 F.3d 1201, 1205–06 (9th Cir.1997), "The attorney-client privilege is a rule of evidence. It does not provide a legal basis to support issuance of the district court's 'protective order,' which purports to bar out-of-court interviews to which the rules of evidence

---

**4.** I wonder how the majority would react if the tables were turned and the state court told the federal court how far its privilege extended. Suppose that under California law the attorney-client privilege is breached, even if no confidential information is disclosed, merely by filing an ineffective assistance claim on state habeas review—the scope of which under state law includes all privileged information relevant to the claim. Under such a scenario, no state privilege would exist when the petitioner enters federal court. (Any constitutional concerns that may be raised by such a law would not be ripe upon habeas review. *See infra.*) Yet, the state could not enter an order, binding on the federal courts, that declared the information non-privileged. Notwithstanding the status of the state attorney-client privilege, a federal court would still be free to apply the federal attorney-client privilege as it sees fit, namely that the privilege is not breached until confi-

dential conversations are actually disclosed. *See* Fed.R.Evid. 501.

When the majority speaks of comity and cooperation, its words thus ring hollow. It seems to me that if a state can arbitrarily eliminate the privilege to avoid the current situation, it may also set the boundaries of how much disclosure is permissible before it chooses to no longer recognize it. That disclosure takes place in federal court does not alter the state's right to fashion the privilege in the manner it wishes so as to best balance its competing interests in encouraging frank communication between attorney and client and discerning the truth through court proceedings. As California's determination under state law would have no effect as to the continuing viability of the federal attorney-client privilege under federal law, a federal court's determination of the scope of its waiver should have no binding effect on the state courts.

do not apply." The current situation is no different.

I agree that this case raises constitutional concerns, but I disagree that they are ripe for us to address. As in *Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the problem of an unconstitutional condition only arises if the prosecutor actually attempts to use specific evidence in trial, and even under *Simmons,* the prosecutor may use compelled information under some circumstances, for example to impeach false testimony introduced at trial. *See United States v. Beltran–Gutierrez,* 19 F.3d 1287, 1288–89 (9th Cir.1994). Such principles are even more applicable when dealing with the attorney-client privilege. *See Rogers,* 751 F.2d at 1079 ("The prejudice [to the defendant from the government possessing privileged information before trial] does not affect [a defendant's] ability to defend himself at trial. There is a fundamental distinction between the use of privileged information at trial, and its use during the investigatory period."); *United States v. White,* 970 F.2d 328, 336 (7th Cir.1992) ("The attorney-client privilege is a testimonial privilege. Consequently, so long as no evidence stemming from the breach of the privilege is introduced at trial, no prejudice results.").

Unless we are convinced that no possible use of discovery material would be constitutional (going well beyond *Simmons* ), we should allow the state court to address the issue. *See United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981) ("Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests."); *see also Coleman v. Thompson,* 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)

("[I]n a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights."). State courts are in a much better position to determine admissibility of such evidence and they are certainly competent to resolve any constitutional issues that may arise.

Nor can the equitable powers of federal courts provide authority to proscribe state courts.

> The power reserved to the states under the Constitution to provide for the determination of controversies in their courts may be restricted by federal district courts only in obedience to Congressional legislation in conformity to the Judiciary Article of the Constitution. Congress, by its legislation, has adopted the policy, with certain well defined statutory exceptions, of leaving generally to the state courts the trial of criminal cases arising under state laws, subject to review by this Court of any federal questions involved. Hence, courts of equity in the exercise of their discretionary powers should conform to this policy by refusing to interfere with or embarrass threatened proceedings in state courts save in those exceptional cases which call for the interposition of a court of equity to prevent irreparable injury which is clear and imminent. . . .

*Douglas v. City of Jeannette,* 319 U.S. 157, 162–63, 63 S.Ct. 877, 87 L.Ed. 1324 (1943); *see also Degen v. United States,* 517 U.S. 820, 823–24, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996) ("Principles of deference counsel restraint in resorting to inherent power, . . . and require its use to be a reasonable response to the problems and needs that provoke it. . . ."); *Perez v. Ledesma,* 401 U.S. 82, 84–85, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971) (holding that district court could not order the suppression of evidence in pending and future state ob-

scenity trial: "The propriety of arrests and the admissibility of evidence in state criminal prosecutions are ordinarily matters to be resolved by state tribunals....").

Especially in deciding Bittaker's claim, which arises in the habeas context under AEDPA—a statute whose "purpose [is] to further the principles of comity, finality, and federalism"—we must be careful to nurture "the historic and still vital relation of mutual respect and common purpose existing between the States and the federal courts." *Williams v. Taylor*, 529 U.S. 420, 436, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). Paramount: we must "limit the scope of federal intrusion into state criminal adjudications and [ ] safeguard the States' interest in the integrity of their criminal and collateral proceedings." *Id.*

Leaving the state courts to consider the scope of its privilege in the first instance strikes such a balance. The federal habeas proceeding is not undermined—the petitioner has a full and fair opportunity to argue his case—and yet federal courts will still be able to enforce any federal interests either on direct review or through habeas review.

Of course, Bittaker would prefer to know in advance whether formerly privileged information may be used against him, but the Constitution does not provide such an accommodation. *See United States v. Martinez–Salazar*, 528 U.S. 304, 316, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000) ("[A] hard choice is not the same as no choice").[5] As the Supreme Court noted in *Upjohn*, "We are acutely aware ... that we sit to decide concrete cases and not abstract propositions of law.... This case-by-case process and the judicial restraint accompanying it have not and cannot produce generally applicable, particularized rules that provide certainty." 449 U.S. at 386, 101 S.Ct. 677. I would have exercised such judicial restraint here.

## IV

That being said, I concur in the result reached by the majority: the district court did not abuse its discretion in entering this particular protective order. Despite the majority's insistence that the protective order preserves the attorney-client privilege in state court, the language of the protective order itself makes no such pretensions.[6] *Cf. Transamerica Computer Co. v. IBM Corp.*, 573 F.2d 646, 652 (9th Cir.1978) (interpreting order that explicitly preserved the privilege in any documents compelled by the court). The court's protective order simply deems the requested discovery "confidential" and allows the Office of the California Attorney General to use the materials only for the purposes of the federal habeas corpus proceeding. While the protective order explicitly pro-

---

**5.** In *Martinez–Salazar*, the trial court refused to dismiss a potential juror for cause when he twice stated that he would favor the prosecution in the defendant's trial because "[One] assume[s] that people are on trial because they did something wrong." 528 U.S. at 308, 120 S.Ct. 774. The defendant was then forced to use one of his peremptory challenges to remove him; later he ran out of such challenges. *Id.* at 309, 120 S.Ct. 774. The Court held that the defendant had a difficult, but not unconstitutional, choice: he could choose not to use his peremptory challenge and then on appeal argue that his Sixth Amendment right to a fair trial had been impaired, or he could use the challenge, although it might be better suited for another prospective juror. *Id.* at 316, 120 S.Ct. 774.

In contrast, a habeas petitioner's choice is not too difficult. He is imprisoned, he believes unconstitutionally, and his first concern is getting out. Any constitutional concerns regarding his retrial are secondary and, in reality, would not stop him from pursuing a valid ineffective assistance of counsel claim.

**6.** See *supra* at 717 n. 1 for the text of the protective order.

hibits disclosure of the materials' contents in the event of a state retrial, it says nothing regarding the ability of the prosecutor to discover those same materials through state court discovery procedures if it determines the privilege was waived.

In fact, Bittaker himself explicitly denies that the protective order prohibits the state courts from considering the preservation of the state attorney-client privilege. *See, e.g.,* Appellee's Brief at 56 ("There are no pending proceedings in California's state court, and Mr. Bittaker cannot seek to have those courts apply California law and protect his privileges in these documents. The *only* way to preserve these issues for consideration by a California court is by issuing a protective order in this federal action." (emphasis in original)). Bittaker requested and received a protective order that merely preserves the status quo so that the state court can consider whether he waived his privilege under state law. Nothing more. In its haste to reach the merits of Bittaker's attorney-client privilege claims, the majority creates the bargain it wishes the district court had entered, rather than enforce the "bargain" actually struck between Bittaker and the district court.

Once viewed correctly, Judge Byrne's protective order is tailored to protect legitimate federal interests. The affront to the federal courts is not a possible breach of the state attorney-client privilege—a consequence of our dual sovereignties—but rather the risk that the prosecutor would use the information we gave him to build his case, circumventing the state discovery processes and any attendant limitations. Such potential abuse of federal discovery provides sufficient authority for entering the protective order.

Federal courts have the discretion to restrict future use of the discovered materials when a party may suffer harm as a result of disclosure. *See, e.g., Harris v. Amoco Production Co.,* 768 F.2d 669, 683–84 (5th Cir.1985) ("A party may generally do what it wants with material obtained through the discovery process, as long as it wants to do something legal. The federal rules do not themselves limit the use of discovered documents or information. Rule 26(c) does, however, afford district courts the ability to impose limits. If the party from whom discovery is sought shows 'good cause,' the presumption of free use dissipates, and the district court can exercise its sound discretion to restrict what materials are obtainable, how they can be obtained, and what use can be made of them once obtained." (citations omitted)). *Accord Parsons v. General Motors Corp.,* 85 F.R.D. 724, 726 (D.Ga.1980) ("This court may impose conditions on the release of information to protect a person or party from any harmful side effects of disclosure." (citing 4 Moore's Federal Practice P 26.67, at 26–487)); *Konrad v. DeLong,* 57 F.R.D. 123, 125 (N.D.Ill.1972) (holding that court has power to prohibit use of expert's testimony in other proceedings in order to prevent abuse of process and intimidation of witness before federal court).

Because habeas is a civil proceeding, the permissible discovery is broader and the free exchange of such discovery creates a situation ripe for abuse: by bringing a habeas petition to exercise his constitutional right, the petitioner must give his entire case to the State, and, if petitioner is found to be unconstitutionally confined, the prosecutor may then use that same discovery to reconvict him. *Cf. Degen,* 517 U.S. at 826, 116 S.Ct. 1777 (noting that protective orders are available to "prevent parties from using civil discovery to evade restrictions on discovery in criminal cases"); *Campbell v. Eastland,* 307 F.2d 478, 487 (5th Cir.1962) ("A litigant should not be allowed to make use of the liberal discov-

ery procedures applicable to a civil suit as a dodge to avoid the restrictions on criminal discovery and thereby obtain documents he would not otherwise be entitled to for use in his criminal suit. Judicial discretion and procedural flexibility should be utilized to harmonize the conflicting rules and to prevent the rules and policies applicable to one suit from doing violence to those pertaining to the other."). The district court can minimize such harm by forcing the parties to start the adversarial process over again, and to proceed through discovery using the processes of the new forum in a subsequent case. If we properly construed the protective order, we would not have to discuss the attorney-client privilege, speculate about waivers, or strong arm the state into following a limited waiver of state law attorney-client privilege; we could simply hold that the district court did not abuse its discretion in limiting the dissemination of discovery materials.

Control over the discovery itself is materially different from control over the consequences of disclosing the discovery. In the former case, the courts are merely insuring that any discovered materials are not later used; if the prosecution wants the information, it must find it somewhere else. In the latter instance, the court is not only insuring the confidentiality of the underlying information in its own proceeding, but it is also curtailing the state courts' authority to make its own admissibility determination. Such noble intentions are simply too ambitious.

Thus, Judge Byrne's protective order does not infringe on the state's right to determine what evidence is admissible. If the prosecution can secure the same information through state discovery processes, state courts can determine admissibility of such evidence; it is only the information gained through the habeas proceeding itself that is off limits. *Cf. Seattle Times*

*Co. v. Rhinehart*, 467 U.S. 20, 34, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984) ("As in this case, such a protective order prevents a party from disseminating only that information obtained through use of the discovery process. Thus, the party may disseminate the identical information covered by the protective order as long as the information is gained through means independent of the court's processes.").

If, indeed, California wishes to guard its attorney-client privilege as jealously as the majority so believes, the protective order provides it every opportunity. While I disagree with the reach of the majority's analysis, I concur in the court's judgment and would affirm the district court's use of its discretion in this case.